**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

<u>Albert Kuperman</u>

    v.                                              Civil No. 06-cv-420-JD

<u>New Hampshire Department
of Corrections, et al.</u>

**REPORT AND RECOMMENDATION**

    Plaintiff Albert Kuperman is an inmate at the New Hampshire State Prison ("NHSP"). Kuperman seeks an injunction from this Court preventing the NHSP authorities from denying Kuperman a kosher diet in line with his religion as a penalty for occasions where they allege that he has failed to eat only the kosher foods provided by the prison. A hearing on Kuperman's motion was held before me on April 18, 2007. Upon consideration of the evidence adduced at the hearing, and the arguments before the Court, I recommend that the motion for a preliminary injunction be granted and Kuperman's religious kosher diet be immediately restored.

<u>Standard of Review</u>

    Preliminary injunctive relief is available to protect the moving party from irreparable harm, so that he may obtain a meaningful resolution of the dispute after full adjudication of

the matter. Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3rd Cir. 1994) (explaining irreparable harm and its effect on the contours of preliminary injunctive relief). Absent irreparable harm, there is no need for a preliminary injunction.

The need to prevent irreparable harm, however, exists only to enable the court to render a meaningful disposition on the underlying dispute. See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 620-21 (1st Cir. 1995) (explaining the purpose of enjoining certain conduct as being to "preserve the 'status quo' . . . to permit the court more effectively to remedy discerned wrongs"); see also Becton v. Thomas, 48 F. Supp. 2d 747, 753 (W.D. Tenn. 1999) ("'The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" (quoting Stenberg v. Cheker Oil Co., 573 F.2d 921,

925 (6th Cir. 1978)). The court's focus, therefore, must always be on the underlying merits of the case, and what needs to be done to ensure that the dispute can be meaningfully resolved.

A preliminary injunction cannot issue unless the moving party satisfies four factors which establish its need for such relief. See Esso Standard Oil Co. v. Monroig-Zavas, 445 F.3d 13, 17-18 (1st Cir. 2006) (discussing the requisite showing to obtain a preliminary injunction); see also Ross-Simons, 102 F.3d at 18-19 (explaining the burden of proof for a preliminary injunction). Those factors are: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Esso Standard Oil, 445 F.3d at 18. If the plaintiff is not able to show a likelihood of success on the merits, the remaining factors "become matters of idle curiosity," id., insufficient to carry the weight of this extraordinary relief on their own. See id. (the "sine qua non of the four-part inquiry is likelihood of success on the merits").

Background

Albert Kuperman is an observant orthodox jew.  He has been incarcerated by the New Hampshire Department of Corrections, in the Northern New Hampshire Correctional Facility and the NHSP since April of 2004.  Upon Kuperman's arrival in prison, he requested and was granted a kosher diet, based on his sincere belief in and practice of Judaism and the dietary requirements of that faith.  Pursuant to the kosher meal program at the prison, Kuperman receives three pre-packaged meals per day.  Kuperman is permitted to supplement his food intake with kosher items from the prison canteen.

At the hearing, Kuperman testified that he has been a lifelong practitioner of orthodox Judaism, and has attempted at all times to practice that faith while in prison.  As part of that practice, Kuperman follows a kosher diet to the extent possible.  Although Kuperman alleges that the pre-packaged kosher meals are not strictly compliant with Jewish dietary law, he acknowledges that they are better than the ordinary prison diet for maintaining his religious practice.

Prior to being granted a kosher diet, Kuperman was required to sign a form acknowledging his awareness that the penalty for

voluntarily eating food not included in the kosher diet was to be removed from the diet for six months.  Kuperman also acknowledged at the hearing that he was aware that prison policies required the same result for an infraction based on eating non-kosher food.  On three occasions since his incarceration began, Kuperman has had his kosher diet privileges revoked for six months for either purchasing or eating food not provided to him by the prison and therefore known to be in compliance with the kosher restrictions.

On the first occasion that his kosher diet was suspended, Kuperman had purchased products containing meat from the canteen. Kuperman testified at the hearing that while he did purchase those products, he did so for another inmate who was "strong-arming" him to obtain items from the canteen, and that the items were not for his own consumption.  On the other two occasions, Kuperman is alleged to have been caught eating chicken that came from the prison kitchen and not from a pre-packaged kosher meal.

Testimony at the hearing from both plaintiff and Rabbi Krinsky, plaintiff's rabbi and spiritual consultant, demonstrated that a chicken is a kosher animal, and produces kosher food as long as it is slaughtered and prepared according to Jewish law.

While the defendant argued that the prison kitchen and preparation methods are not likely to comply with Jewish dietary law, no proof was offered as to how the chicken was prepared and whether it was, in fact, prepared and slaughtered pursuant to kosher law.  In any event, Kuperman was twice suspended from his kosher diet for six months for eating chicken in the prison chow hall.

While Kuperman's kosher diet was suspended, however, the prison chaplain made an effort to accommodate Kuperman's religious beliefs by arranging for Kuperman to receive a vegetarian diet so that he wouldn't have to eat the non-kosher meat at the prison, and for arranging for certain kosher packaged foods to be brought in to the prison both to supplement Kuperman's vegetarian diet and to allow Kuperman to observe Jewish holidays.

## Discussion

I. The Four Preliminary Injunction Factors

    A. Likelihood of Success on the Merits

The action filed by Kuperman relevant to this injunction is a claim that the prison has violated both his First Amendment right to freely exercise his religion, and his right to practice

his religion as guaranteed by the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. ("RLUIPA").  Kuperman alleges that the regulation that has mandated a six month suspension of his kosher diet violates his First Amendment and federal statutory rights by improperly impinging on his religious practice.

   Convicted prisoners do not forfeit all of the protections of the Constitution upon incarceration.  See Bell v. Wolfish, 441 U.S. 520, 545 (1979).  "In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system," Pell v. Procunier, 417 U.S. 817, 822 (1974), including the right to free exercise of religion, see O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citing Cruz v. Beto, 405 U.S. 319, 322 (1972)).  Prisons must provide all inmates reasonable opportunities to exercise their religious freedom.  See Cruz, 405 U.S. at 322 n.2.

   A prisoner's sincerely held religious beliefs must yield if contrary to prison regulations that are "reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987).  This Court must accord prison administrators

significant deference in defining legitimate goals for the corrections system, and for determining the best means of accomplishing those goals.  See Overton v. Bazzetta, 539 U.S. 126, 132 (2003); Pell, 417 U.S. at 826-27.

A court, in evaluating whether or not a particular prison regulation is constitutional, considers four factors: (1) whether the regulation has a "valid, rational connection" to a legitimate penological objective, (2) "whether any alternative means are open to inmates to exercise the asserted right," (3) "what impact an accommodation of the right would have on guards and inmates and prison resources," and (4) "whether there are ready alternatives to the regulation."  Overton, 539 U.S. at 132 (citing Turner, 482 U.S. at 89-91).  Applying the evidence introduced at the hearing on this matter to the four Turner factors set out above, I find as follows.

First, the regulation in question, as set forth in the prison's Policy and Procedure Directive ("PPD") 7.17, which governs religious programming and diets, imposes a penalty, to be imposed by an inmate's Unit Manager, of suspension of a religious diet for a period of six months "[w]hen there is a belief that an inmate receiving a religious diet has consumed or been in

possession of food items that violate their approved religious diet" and the Unit Manager determines that the "inmate knowingly violated the religious diet" and "believes the act was intentional."  PPD 7.17 G.2.d.  The defendant asserts a valid penological objective in this regulation in that it supports providing religious meals only to inmates with sincerely held religious beliefs, rather than to inmates who are feigning religious belief in order to get a better food plan than the standard prison fare.  This is a valid penological objective, as the provision of special meals does require a financial expenditure, albeit a small one, on the part of the prison, as well as causing the prison to go to the trouble of obtaining the meals, making sure they reach the inmates, and heating them.  Of course, the purchase of prepackaged meals also saves the prison from having to prepare meals for those individuals who receive Kosher meals, but, the Court recognizes that the prison has a valid interest in maintaining the integrity of its intention to provide religious meals to sincere practitioners.

I find that, under the first prong of the <u>Turner</u> analysis, that this regulation does not have a valid and rational connection to the legitimate penological objective asserted by

the defendants.  The prison has asserted a policy of maximizing an inmate's access to his spiritual practice.  See PPD 7.17.IV.E. ("The institution shall extend to all inmates the greatest amount of freedom and opportunity for pursuing any recognized religious belief or practice.  This shall be accomplished within the boundaries of security, safety, discipline and the orderly operation of the institution.").  It does not rationally follow that removing an inmate, who holds a sincere religious belief, from the practice of his faith because on one occasion he failed to follow his religious diet, will achieve the goals of security and order of the institution.  While a sixth month suspension would be rationally connected to punish an inmate who has not demonstrated a sincere religious belief, and is not, therefore, entitled to the practice of a particular religion, that is not the situation presented here.

The testimony at the hearing was undisputed that Kuperman is a practicing orthodox jew who holds a very sincere belief in Judaism.  It appears that even the prison's non-testifying Chaplain ascribes to that belief, as he has taken significant steps to support Kuperman's ability to practice his religion. Further, the evidence at the hearing clearly established that

following a kosher diet is an essential part of the practice of an observant orthodox jew.  Removing an orthodox jew from a kosher diet serves, religiously speaking, to distance an inmate from his own spirituality and religious practice.  It is not, in other words, a neutral act.  Such a move has a direct negative impact on the inmate's ability to better himself or maintain himself spiritually, as actual harm is done to both the physical being and the spirituality of the inmate.

   If a diabetic inmate were placed on a medically appropriate diet, and was then caught purchasing a candy bar from the canteen, the prison would not be justified in removing the inmate from his medical diet and forcing him to eat a high sugar diet for six months for the violation.  Similarly, an inmate eating an extra helping or unauthorized item isn't restricted to bread and water for six months.  These inmates may be legitimately punished for violating prison rules, but they are not removed from the diet that the inmate must try to maintain. Similarly, a regulation that imposed punishment, such as a lack of canteen privileges, or the necessity of eating in one's cell, or even a period of time in segregation, for violating a kosher diet, would serve to deter the insincere from getting a kosher diet, but

would also allow those with a sincerely held religious belief to be punished for their mistakes without disallowing their religious practice.

The second <u>Turner</u> factor is "whether any alternative means are open to inmates to exercise the asserted right."  I find, based on the uncontroverted testimony of both Kuperman and Rabbi Krinsky, that there is no alternative means of achieving what the laws of kosher are designed to achieve.  The Rabbi testified that the practice of keeping kosher is essential to the Jewish way of life.  Kuperman also testified that the practice of keeping kosher is necessary to maintaining the physical state necessary to pursue his spiritual and religious practice.  Kuperman acknowledged that a violation of kosher diet will hinder that practice, but that if the violation is isolated, it can be atoned for and remedied religiously, but that if the kosher diet is withheld altogether, such atonement is very difficult or impossible.  The defendant did not offer any alternative means by which Kuperman could exercise this part of his religious practice, except to rely on other aspects of Jewish practice in the absence of a kosher diet. Accordingly, I find that there has

been no demonstration of any sufficient alternative means open to Kuperman to exercise his right to practice orthodox Judaism.

Third, I consider the impact an accommodation of Kuperman's right to a kosher diet would have on the prison. I find that the only evidence at the hearing was that accommodating Kuperman's kosher diet needs would cost the prison a small amount of money, as a kosher diet costs more than a nonkosher diet, although it appears the total cost to the prison of keeping Kuperman on a kosher diet is minimal. Because systems are already in place to provide inmates who have sincerely held religious beliefs with kosher meals, I find that there will be no disruption in prison security or order in providing Kuperman with kosher meals. To the extent the defendant is concerned that other inmates may be tempted to claim that they are Jewish in order to obtain a kosher meal, my ruling applies only to Kuperman as someone who has a demonstrated sincere belief that has been accepted by the prison Chaplain and by Kuperman's own rabbi.

Fourth, I examine whether there are ready alternatives to the regulation. As stated above, there are any number of ways that prisons punish inmates who do not stick to their prescribed meal plans that do not involve taking them off of an essential

diet.  These punishments would serve to keep inmates without sincere religious beliefs off of religious diets and would also enforce the prison's interest in maintaining a religious diet program in an orderly and cost-effective fashion.  Therefore, I find there are ready alternatives to the current regulation.

Under the Turner factors, I find that this particular prison regulation, PPD 7.17.V.G.2.d., is not constitutional when applied in such a way as to suspend an inmate with sincerely held religious beliefs from his religious diet for limited incidents of violations of the diet.  Because I find that this regulation has been applied to Kuperman in such a way that his First Amendment right to free exercise has been abridged, I find that Kuperman is likely to succeed on the merits of his First Amendment and RLUIPA claims.

    B.    <u>The Potential for Irreparable Harm To Kuperman if the Injunction is Denied</u>

As discussed above, Kuperman and Rabbi Krinsky both testified that keeping a kosher diet is essential to the practice of orthodox Judaism.  In particular, Kuperman testified that some Talmudic scholars teach that failure to maintain kosher laws can permanently damage a spiritual practice.  I find that because the evidence at the hearing demonstrated that a kosher diet is

essential to an orthodox Jewish practice, that a significant suspension from access to that diet, such as the six months suspensions imposed here, does hold the potential for irreparable harm.

    C.    <u>The Balance of Relevant Impositions</u>

Again, I have discussed in my <u>Turner</u> analysis that there is a minimal financial cost to the prison in providing Kuperman with six months of Kosher meals.  Beyond that, however, there is no indication that the prison would have to reallocate any personnel or retool the operations of the institution to accommodate Kuperman's dietary needs.  The imposition on Kuperman and his religious practice, however, is significant.  I find that the balance of relevant impositions weighs in favor of granting the injunction.

    D.    <u>The Effect of the Court's Ruling on the Public Interest</u>

While the public certainly has an interest in governmental operations, expenses, and the treatment of prisoners, as well as the ability of the citizenry to freely exercise their religious practices, I find that in this case, the effect of my ruling will be minimal.  As stated above, no disruption to the prison's operation need occur, and it is hard to fathom that any member of

15

the public aside from Kuperman himself is personally affected by the granting or denial of this injunction.  Accordingly, I find that this factor does not weigh on my recommendation in either direction.

## Conclusion

For the reasons stated herein, I recommend that the injunction requested issue, and that Kuperman be restored to a kosher diet immediately.  Further, I recommend the prison be enjoined from suspending Kuperman's kosher diet altogether based on isolated dietary infractions, and instead find alternative means of punishment that do not lack a valid connection to the policy of supporting Kuperman's religious practice pursuant to his sincerely held religious beliefs.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of

Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992);

United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

                                         /s/James R. Muirhead
                                         James R. Muirhead
                                         United States Magistrate Judge

Date:     April 18, 2007

cc:       Nancy Sue Tierney, Esq.
          Andrew Livernois, Esq.